Lester G. ABELOFF, et al.,

v.

Leslie R. BARTH, et al.

Robert H. BATES, et al.,

v.

Leslie R. BARTH, et al.

James AMEND, et al.,

v.

Leslie R. BARTH, et al.

Civ. A. Nos. 85–3669–WD,
85–3672–WD, 85–3673–WD.

United States District Court,
D. Massachusetts.

Feb. 17, 1988.

James E. McGuire, John A. Wortmann, Jr., William J. Hudak, Brown, Rudnick, Freed & Gesmer, Boston, Mass., for plaintiffs.

James S. Parver, Proskauer, Rose, Goetz & Mendelsohn, Dale A. Schreiber, Schwartz, Klink & Schreiber, New York City, Robert W. Mahoney, Hale and Dorr, Boston, Mass., for defendants.

Nancy E. Waters, John P. Driscoll, Lisa C. Wood, Nutter, McClennen & Fish, Boston, Mass., for Deloitte, Haskins.

Frances S. Cohen, Joseph D. Steinfield, Jane S. Schacter, Hill and Barlow, Boston, Mass., for George Marvin Smith, Richard Scholnick.

Stephen P. Scaring, Richard P. Broder, Mineola, N.Y., Eliot D. Lobel, Peckham, Lobel, Casey & Tye, Boston, Mass., for Network Appraisal Co., Inc.

MEMORANDUM ON THE MOTION TO DISMISS (#21) THE THIRD AMENDED COMPLAINTS IN EACH OF THE ACTIONS TO THE EXTENT THAT THE MOTION SEEKS DISMISSAL ON GROUNDS OF LACK OF PERSONAL JURISDICTION AND/OR IMPROPER VENUE OR, IN THE ALTERNATIVE, TRANSFER TO THE U.S. DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

ROBERT B. COLLINGS, United States Magistrate.

The multi-count complaints in the three consolidated actions at bar purport to state claims against the named defendants on the basis of federal securities laws, RICO, various state blue sky laws and common law tort principles. All of the 149 individual plaintiffs were purchasers of limited partnership interests in three separate limited partnerships formed to acquire, syndicate and operate a trio of office buildings located in greater metropolitan Houston, Texas. A total of nine corporate[1] and

---

1. Seven corporate entities are named as defendants in each complaint. The general corporate partner of the limited partnership changes respectively in each of the three actions.

three individuals are named as defendants in the complaints. Seven of the corporate defendants, together with the three individuals, hereinafter collectively referred to as the "Barth defendants," have filed a Motion to Dismiss (# 21) which the parties have consented to have decided by the undersigned pursuant to 28 U.S.C. § 636(c).

The motion to dismiss filed by the Barth defendants can be divided into two parts. The first part of the motion seeks dismissal of the complaints pursuant to Rule 12(b)(2), F.R.Civ.P. and (3) for lack of personal jurisdiction and improper venue or, alternatively, transfer of the actions pursuant to 28 U.S.C. §§ 1404(a) and 1406(a) to the United States District Court for the District of Connecticut at New Haven. The second part of the motion seeks dismissal of the complaints pursuant to Rule 12(b)(1), F.R. Civ.P. for lack of jurisdiction over the subject matter, Rule 12(b)(6) for failure to state a claim upon which relief can be granted, and Rule 9(b) for failure to allege fraud with particularity or, alternatively, to strike certain of the allegations pursuant to F.R.Civ.P. 12(f). This memorandum and order deals only with the first part of the motion.

The 149 plaintiffs hail from 16 different states with approximately 32 or 39[2] residing in the Commonwealth of Massachusetts. The corporate Barth defendants are described in the complaints as a coordinated group of affiliated Connecticut corporations engaged in the business of marketing real estate for investment purposes (¶ 4).[3] Southwest Bissonnet, Inc., a Connecticut corporation with a usual place of business in New Haven, is alleged to be the sole general partner of the limited partnership Barrick Westwood and the issuer of the Barrick Westwood Limited Partnership Units sold to the plaintiffs (¶ 5). I-10 East Ralston, Inc., a Connecticut corporation with a usual place of business in New Haven, is alleged to be the sole general partner of the limited partnership Barrick Ralston and the issuer of the Barrick Ralston Limited Partnership Units sold to the plaintiffs (¶ 5). 515 North Belt, Inc., a Connecticut corporation with a usual place of business in New Haven, is alleged to be the sole general partner of the limited partnership Barrick North Belt and the issuer of the Barrick North Belt Limited Partnership Units sold to the plaintiffs (¶ 5). The Barrick Group, Inc. ("The Barrick Group"), a Connecticut corporation with a usual place of business in New Haven, is alleged to have sold to the three limited partnerships the real estate which constituted the partnerships' primary assets (¶ 6). The Barrick Group is further alleged to be the holder of "wrap" mortgages on these properties (¶ 6). In the various offering memoranda, The Barrick Group was denoted as the "seller" of the limited partnership units (¶ 6).

Barrick Property Management, Inc. ("Barrick Management"), a Connecticut corporation with a usual place of business in New Haven, is alleged to have been represented to be an experienced property manager and the entity that would manage the real estate owned by the limited partnerships (¶ 8). North American Investment Resources, Inc. ("NAIR"), a Connecticut corporation with a usual place of business in New Haven, is alleged to have been the financial advisor to the affiliated group of Barrick companies specifically providing financial direction and assistance in the sale of the limited partnership units (¶ 7). The final corporate Barth defendant is Barth, Richheimer and Friedman, P.C. (the "Law Firm"), a Connecticut professional corporation with a principal place of business in New Haven (¶ 9). The Law Firm is alleged to have participated in the preparation of

---

**2.** Although the precise number of Massachusetts plaintiffs is unclear from the papers submitted by the parties, an exact accounting would not in any event be dispositive of the defendants' motion to dismiss.

**3.** The designation of paragraphs refers to the third amended complaint (# 18) in the case denoted 85–3669–WD as representative of the

three consolidated complaints. Although the plaintiffs have filed a Fourth Amended Complaint and a Fifth Amended Complaint in these cases, the rulings made herein with respect to the Third Amended Complaint, in effect, dispose of the Barth defendants' motions to dismiss the Fourth and Fifth Amended Complaints on the same grounds.

the offering materials for the limited partnerships, as well as rendering tax and legal advice to the affiliated group of Barrick companies with respect to the limited partnership offerings (¶ 9).

The three individual Barth defendants, Leslie R. Barth ("Barth"), David E. Richheimer ("Richheimer") and Dana E. Friedman ("Friedman") are alleged to be the owners and controlling persons of the corporate Barth defendants within the meaning of the securities laws (¶ 4). Each is a resident of the State of Connecticut and each is alleged to hold key controlling positions within the affiliated corporate Barth defendants' management structures (¶¶ 10, 11 and 12).

After the motion to dismiss by the "Barth defendants" was filed and argued and while the matter was *sub judice*, bankruptcy proceedings were commenced with respect to one of the corporations, i.e. The Barrick Group, Inc., and one of the individuals, i.e. Leslie R. Barth, of the group denoted "Barth defendants." Because of the stay of litigation provided by the bankruptcy laws, the rulings contained herein do not purport to decide the motion to dismiss as to those two defendants. However, the rulings contained herein would dispose of the motion as to these two defendants if the Court were permitted to issue a ruling on the motion with respect to them.

The factual background of plaintiffs' claims is not in substantial dispute. In 1983, the Barrick Group purchased three office buildings in Houston, Texas. The properties were thereafter conveyed to the three limited partnerships, Barrick Westwood, Barrick Ralston, and Barrick North Belt, which had been formed to acquire, syndicate and operate the projects. Limited partnership units were then sold to investors, including the plaintiffs. Each offering was marketed by means of a separate, although substantially similar, offering memorandum which had been drafted and prepared with the direct participation of all of the Barth defendants, corporate and individual. These memoranda purported to be a full and accurate description of the offering being made and the investment opportunity presented. In 1985, the Houston projects failed and became subject to foreclosure proceedings by the mortgage holder. Consequently, the plaintiffs' investments were rendered worthless.

The plaintiffs' basic allegation in their complaints is that they were each induced to invest in the limited partnerships in reliance on material oral and written misrepresentations and omissions made by the Barth defendants in the offering memoranda and materials during the offering period. The complainants enumerate twenty-five specific misrepresentations and/or omissions of material fact which they claim the Barth defendants knew or should have known were misleading as presented. The plaintiffs predicate the defendants' purported federal securities law liability upon the following alleged violations: (1) all corporate and individual Barth defendants, jointly and severally, under 15 U.S.C. § 77*l*(2) as sellers and/or aiders and abetters; (2) the individual Barth defendants, jointly and severally, under 15 U.S.C. § 77*o* as controlling persons; (3) all corporate and individual Barth defendants under 15 U.S.C. § 78j(b) and Rule 10b–5 for use of a device, scheme or artifice to defraud in the sale of securities; (4) all corporate and individual Barth defendants, jointly and severally, under 15 U.S.C. § 78t(b) as controlling persons and/or aiders and abetters; and (5) all corporate and individual Barth defendants under 15 U.S.C. § 77q(a) for obtaining money by use of misrepresentations or omissions of material facts in the sale of securities. The remaining counts of the complaints against the Barth defendants include an additional federal claim for violation of 18 U.S.C. § 1962(c) of the Racketeer Influence and Corrupt Organizations Act (RICO), as well as state claims alleging common law fraud, violations of the blue sky laws applicable to each plaintiff and, finally, claims for breach of fiduciary duty against the three general partners of the limited partnerships and Barth as an individual.

Jurisdiction over the federal securities claims is based on 15 U.S.C. § 77v (Section 22 of the Securities Act of 1933), 15 U.S.C.

§ 78aa (Section 27 of the Securities Act of 1934) and 28 U.S.C. § 1331(a). Jurisdiction over the state law claims is premised on the doctrine of pendant jurisdiction. Venue is alleged to be proper in the United States District Court for the District of Massachusetts pursuant to 15 U.S.C. §§ 77v and 78aa and 28 U.S.C. § 1391.

Turning to the provisions of the Securities Exchange Act of 1934 first, Section 27 grants exclusive jurisdiction to adjudicate claims arising under the Act to the federal courts and provides for venue and service of process. In pertinent part, Title 15 U.S.C. § 78aa reads:

> The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found . . .

Unquestionably, the language of this section is broad. It is "designed to provide" a "wide accessibility" to the federal courts in order to adjudicate claims of securities fraud. *Bertozzi v. King Louie International, Inc.*, 420 F.Supp. 1166, 1170 (D.R.I. 1976). The section seeks to "facilitate that goal by enabling suits to enforce rights created by the Act to be brought wherever a defendant could be found." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 156, 96 S.Ct. 1989, 1994, 48 L.Ed.2d 540 (1976).

There is little room for doubt that this statute confers personal jurisdiction to this court over the defendants alleged to have violated the provisions of the Securities Exchange Act of 1934 if the venue is proper. As the Second Circuit has written:

> It is simply too late in the day to argue that Section 27 does not authorize nationwide service of process on any individual named in the complaint, provided, of course, the complaint states a claim under the 1934 Act. *Mariash v. Morrill*, 496 F.2d 1138, 1142 (2 Cir.1974). *Accord Fitzsimmons v. Barton*, 589 F.2d 330, 332–4 (7 Cir., 1979); *Securities Investor Protection Corporation v. Vigman*, 764 F.2d 1309, 1314–1316 (9 Cir., 1985).

With respect to venue, a district judge in this Court has written that:

> To establish venue under Section 27, "[i]t is only necessary to show that an act in furtherance of the unlawful plan was committed within the district . . ." *Wharton v. Roth*, 263 F.Supp. 922, 923 (E.D.N.Y.1964). *See Hooper v. Mountain States Securities Corporation*, 282 F.2d 195 (5th Cir.1960), *cert. denied*, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961). The venue-sustaining act need not constitute the core of the alleged violation, *Sohns v. Dahl*, 392 F.Supp. 1208, 1215 (W.D.Va.1975), nor even be illegal, *Mayer v. Development Corp. of America*, 396 F.Supp. 917, 929 (D.Del. 1975), so long as "[it] represents more than an immaterial part of the alleged violations." *Sohns v. Dahl, supra* at 1215. *S–G Securities, Inc. v. Fuqua Investment Company*, 466 F.Supp. 1114, 1121 (D.Mass., 1978).

In addition, there is a co-conspirator venue theory which is applicable to litigation involving violations of the federal securities laws. Under this theory:

> . . . where an action is brought against multiple defendants alleging a common scheme of acts or transactions in violation of securities statutes, so long as venue is established for any of the defendants in the forum district, venue is proper as to all defendants. This is true even in the absence of any contact by

some of the defendants in the forum district. *Securities Investor Protection Corporation v. Vigman, supra,* at 1317 citing Wright, Miller & Cooper, *Federal Practice and Procedure:* Jurisdiction § 3824 (1976).

In the *Securities Investor* case, the Ninth Circuit Court of Appeals noted that "[t]he co-conspirator venue theory has been adopted by the Second and Fifth Circuits as applied to multi-defendant litigation alleging violations of the federal securities statutes." *Id.* citing *Wyndham Associates v. Bintliff,* 398 F.2d 614 (2 Cir.) *cert. denied,* 393 U.S. 977, 89 S.Ct. 444, 21 L.Ed.2d 438 (1968); *Hilgeman v. National Insurance Co. of America,* 547 F.2d 298 (5 Cir., 1977). In the *Hilgeman* case, the Court wrote that:

> The jurisdiction of the Texas court does not depend on whether Goodkind performed an act or transaction in that district; it is sufficient if there occurred in that district 'any act or transaction' by any defendant in furtherance of a manipulative scheme in which Goodkind knowingly participated. *Hilgeman, supra* at 302, n. 12 (5th Cir.1977) *See also Bertozzi v. King Louie International, Inc., supra,* 420 F.Supp. at 1171.

Having outlined these basic principles, an examination of the facts as alleged in the complaints and the affidavits filed by the parties is in order.

It is alleged in the complaints that the Barth corporate defendants are a "coordinated group of affiliated Connecticut corporations" that are "commonly owned, share physical facilities, have common personnel, and acted in concert with one another in connection with [the three limited partnership offerings]" (¶ 4). At all relevant times, the corporate Barth defendants are alleged to have been under the control and direction of the individual Barth defendants, Barth, Richheimer and Friedman (¶ 4). Barth as an individual is alleged to be the controlling shareholder of each of the affiliated Barth companies and holder of the following corporate positions: The Barrick Group — President/Treasurer/Director;

NAIR — President/Treasurer/Director; Barrick. Management—President/Treasurer/Director; Law Firm—Partner/Director; Southwest Bissonet, Inc., I–10 East Ralston, Inc., and 515 North Belt, Inc.—Board Chairman/President/Treasurer (¶ 10). Barth's responsibilities involved direct oversight of the operations of the Barth corporate defendants (¶ 10). Richheimer is alleged to hold the following corporate positions: The Barrick Group—Vice President; NAIR—Vice President/Secretary; Barrick Management—Vice President/Secretary; Law Firm—Partner; Southwest Bissonet, Inc., I–10 East Ralston, Inc. and 515 North Belt, Inc.—Vice President/Secretary (¶ 11). Friedman is alleged to hold the following corporate positions: Partner—Law Firm; Director—The Barrick Group/Property Management and Administration Division; Chief Real Estate Counsel—Affiliated Barth Companies (¶ 12).

Each of the Barth defendants is alleged to have directly participated in the preparation of the offering memoranda and materials utilized in connection with the sale of limited partnership units to the plaintiffs (¶ 19). They are each alleged to have made false or misleading representations concerning the limited partnership offerings to the plaintiffs upon which they relied in investing in the projects (¶ 21). Each of the Barth defendants is alleged to have made offers or sales of limited partnership units to the plaintiffs and others in the Commonwealth of Massachusetts and elsewhere by use of the mails, telephone and other means of interstate commerce (¶¶ 1, 20). Finally, each of the Barth defendants is alleged to have received income either directly or indirectly from the sale of limited partnership units (¶ 14).

In support of their motion, the defendants have submitted the affidavits of Dana E. Friedman (# 24), Leslie R. Barth (# 25) and David E. Richheimer (# 26).[4] Summarized, these affidavits deny any significant contact with Massachusetts by the three individuals personally. Each avers that he is a resident of Connecticut, owns no personal or real property in Massachusetts,

**4.** Reference is made to docket numbers in the case denoted 85–3669–WD.

maintains no bank accounts or offices nor pays any taxes in the Commonwealth, and has never contracted to supply services or derived substantial revenue from goods consumed or services rendered in the Commonwealth. Each individual defendant denies having offered or sold or participated in the offer or sale of limited partnership units in Massachusetts. In like manner, with respect to the Barth corporate defendants, Leslie R. Barth denies that those entities have had any contact with Massachusetts. Of particular significance are the averments that none of the corporate defendants transact or solicit any business, derive any substantial revenue from or engage in any persistent course of conduct in the Commonwealth. It is denied that the entities have any agent or representative in this jurisdiction or that any person has been appointed to receive service of process on their behalf in Massachusetts. Finally, it is asserted that none of the corporate Barth defendants offered or sold any limited partnership units to the plaintiffs in Massachusetts or participated in the offer or sale of such units in Massachusetts.

The plaintiffs have filed three affidavits in opposition to the defendants' motion to dismiss. The first is that of plaintiff, Robert E. Eaton, Jr. (# 41), a Massachusetts resident who invested in both the Barrick North Belt Limited Partnership and the Barrick Ralston Limited Partnership (¶¶ 1, 2). Mr. Eaton is the Vice-President of Buttonwood Securities Corporation of Massachusetts, a registered broker/dealer of securities with a principal place of business in Boston, Massachusetts (¶ 3). Mr. Eaton avers that he first came in contact with the Affiliated Barrick Companies (the Barth corporate defendants), which he understood to be a group of companies headed by Leslie R. Barth and his associates, in 1982 when George Marvin–Smith came to his Boston office to discuss a syndication being marketed by the companies called the Promenade Plaza Limited Partnership (¶ 5). From the fall of 1982 through the end of 1984, Mr. Eaton states that he was repeatedly and regularly solicited both personally and in his official Buttonwood capacity by the Barrick Companies with re-

gard to at least ten investment offerings that they sponsored, including the three limited partnerships involved in this litigation (¶ 6). Eaton has spoken with representatives of the Barrick Companies over the telephone at least one hundred times, has had meetings with them in the Commonwealth at least five times, and has received written materials in Massachusetts with respect to these offerings (¶ 6).

With specific reference to the limited partnerships at issue, Mr. Marvin–Smith, who Mr. Eaton understood to be an attorney associated with Barth and an employee of the Barrick Companies, visited his office in Boston in the Spring of 1983 at which time Marvin–Smith described the three Houston offerings to Eaton (¶ 7, 8). Following this meeting, Marvin–Smith sent numerous documents respecting these limited partnerships to Eaton, including summaries of the offerings, promotional material on the Barrick Companies, and at least two dozen copies each of documents entitled Barrick Westwood Limited Partnership/Confidential Private Placement Memorandum, Barrick North Belt Limited Partnership/Confidential Private Placement Memorandum, and Barrick Ralston Limited Partnership/Confidential Private Placement Memorandum (¶ 9). In these memoranda, Marvin–Smith was identified as a co-director of the Affiliated Barrick Companies' "property acquisition, development and marketing division" and a principal in the law firm of Barth, Richheimer, Marvin–Smith, Friedman and Scholnick (¶ 10). The offering memoranda described The Barrick Group, Inc. as the "seller" of the securities, North American Investment Resources, Inc. as the "banking liaison", Barrick Property Management, Inc. as the "property manager" and the law firm of Barth, Richheimer, Marvin–Smith, Friedman and Scholnick as tax counsel (¶ 11). Each of the offering memorandum stated that the "general partner and its affiliates is a coordinated group of companies that manages, markets and sponsors real estate ventures and engages in real estate related business. It pursues none of these activities separately but rather works concurrently with ev-

ery project with which it is involved" (¶ 11). The offering memoranda further indicated that each of the identified entities "were to receive substantial fees as a result of their participation in the syndications" (¶ 12).

Following three Boston visits and numerous telephone conversations with Marvin–Smith, as well as two trips from Boston to Houston with Marvin–Smith, Eaton notified Marvin–Smith of his decision to invest in Barrick North Belt and Barrick Ralston (¶¶ 13, 14). Eaton thereafter received a package of closing documents from the Affiliated Barrick Companies which he completed in Massachusetts and returned by mail to the companies' offices in New Haven, Connecticut. Included in the documents which he mailed were his checks drawn on his Boston bank account (¶¶ 14, 15).

The affiant of the plaintiffs' second affidavit is Daniel Cadiff, a Massachusetts resident-plaintiff who invested in the Barrick North Belt Limited Partnership (# 42, ¶¶ 1, 3). At the time of his investment, Mr. Cadiff was the Executive Vice–President and National Sales Manager of WZW Financial Services, Inc., a registered securities broker/dealer (¶ 2). In a manner similar to that described by Mr. Eaton, Cadiff states that he spoke with representatives of the Affiliated Barrick Companies in his Boston office and over the telephone on several occasions regarding the Houston limited partnership offerings (¶¶ 4, 5, 6 and 7). Cadiff received materials concerning the limited partnerships from the Barrick Companies through the mail in his Boston office, including a set of closing documents, after he had decided to invest (¶¶ 8, 9 and 10). Cadiff declares that he filled out the closing documents in Boston and returned them to the Barrick Companies' New Haven, Connecticut offices, together with his check drawn on his Massachusetts bank account (¶ 10).

The plaintiffs' third affidavit (# 43) contains certified copies of certain business records maintained in the ordinary course of business at the Securities Division of the Office of the State Secretary of the Commonwealth of Massachusetts. The documents, to the extent that they pertain to the Barrick Ralston Limited Partnership, include a cover letter to the Securities Division indicating the enclosure of a Notice of Claim of Exemption for the limited partnership, a copy of the Confidential Offering Memorandum and a Uniform Consent To Service of Process form by which Barrick Ralston appointed the Securities Commissioner of Massachusetts to accept service on its behalf. This consent form was signed by Leslie R. Barth as President and Dana E. Friedman as Secretary of I–10 East Ralston, Inc., general partner of Barrick Ralston Limited Partnership. Also included is correspondence by and between the law firm Barth, Richheimer, Marvin–Smith, Friedman and Scholnick, P.C. and the Massachusetts Securities Division of the Department of the State Secretary. Similarly, with respect to the Barrick North Belt Limited Partnership, there is a transmittal letter indicating the enclosure of a Notice of Claim of Exemption, a copy of the Confidential Offering Memorandum and a Consent to Service of Process form signed by David E. Richheimer, V.P. and Dana Eric Friedman, Secretary of 515 North Belt, Inc., general partner of Barrick North Belt Limited Partnership. Once again, there are copies of correspondence by and between Barth, Richheimer, Marvin–Smith, Friedman and Scholnick, P.C. and the Massachusetts Securities Division of the Department of the State Secretary. Finally, the keeper of the records of the Massachusetts Securities Division has listed six other limited partnerships for which the division has a record of exemption filings made by the Affiliated Barrick Companies. The Barrick Westwood Limited Partnership is included on that list. Five of those six limited partnerships were named by Mr. Eaton in his affidavit as offerings about which he had discussions with representatives of the Barrick Companies and for which he received written materials in Massachusetts (# 41, ¶ 6).

At first blush, the affidavits submitted by the parties appear to be in conflict. Upon closer examination, however, it is clear that all the corporate defendants have done is to deny, in broad terms, the plain-

tiffs' assertions; they have failed to dispute the rather detailed factual assertions contained in the affidavits submitted by the plaintiffs. The corporate Barth defendants do not contest the fact that various documentary materials, including copies of the offering memoranda for each of the three limited partnerships which represent the core of the plaintiffs' claims, were mailed to, received and relied upon in Massachusetts by plaintiff investors. Nor is there any doubt that the three offerings, as well as numerous other Affiliated Barrick Companies' ventures, were registered with the Securities Division of the Department of the State Secretary of Massachusetts. Based on the correspondence submitted, it appears that these registrations were effectuated through the mail. The corporate entities do not deny that their representatives made telephone calls to and received telephone calls from plaintiffs in Massachusetts with respect to possible investment in the three limited partnerships, as well as other Affiliated Barrick Companies' offerings. There is no apparent dispute that packets of closing documents to purchase limited partnership units were mailed to investors in Massachusetts, completed within the Commonwealth and returned via the mail to Connecticut with checks drawn on Massachusetts bank accounts enclosed. In sum, although the corporate Barth defendants deny having offered or sold, or participated in the offer or sale of limited partnership units to plaintiffs in Massachusetts, the entities do not specifically deny that they caused repeated interstate mailings and telephone calls to be made to the Commonwealth the substance of which Massachusetts plaintiffs relied upon in making their investments in the three limited partnerships.

■ The crux of the plaintiffs' claims is that they were induced by and relied upon allegedly false, misleading representations and omissions by the defendants in the offering materials in purchasing limited partnership units. These various mailings and telephone conversations played a significant role in disseminating this allegedly false and misleading information to the Massachusetts plaintiffs and as such were

material acts providing adequate grounds for venue in the Commonwealth under § 27 of the Securities Exchange Act of 1934. In the oft-cited words of the Fifth Circuit:

> ... any use of the mails or other interstate facilities made with the forum district constituting an important step in the execution of the fraudulent, deceitful scheme or in its consummation is sufficient to render venue proper in that district. *Hooper v. Mountain States Securities Corporation*, 282 F.2d 195, 204–205 (5 Cir., 1960), *cert. denied*, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); *see also Mariash v. Morrill*, 496 F.2d 1138, 1144 (2 Cir., 1974); *Sarratt v. Walker*, 405 F.Supp. 132, 134 (D.D.C., 1975); *Ritter v. Zuspan*, 451 F.Supp. 926, 930 (E.D.Mich., 1978); *Clement v. Pehar*, 575 F.Supp. 436 (N.D.Ga., 1983).

Moreover, as Chief Judge Pettine has written:

> ... the Court is not convinced that an act which "constitute[s] an important step in the execution of the fraudulent, deceitful scheme or in its consummation" ... loses its materiality because its multistate consequences are diffuse and not concentrated in the forum state. (Citation omitted) *Bertozzi v. King Louie International, Inc., supra*, 420 F.Supp. at 1170.

Thus, although the plaintiffs are residents of 16 different states, at least as many plaintiffs reside in Massachusetts as in any other state. Given the significant number of plaintiffs from this district, the alleged acts in Massachusetts are not immaterial and, in fact, support venue in this forum.

The averments of the complaints are sufficient to allege that all the Barth defendants, corporate and individual, purportedly acted in concert in a common scheme or transactions to violate the securities laws. The plaintiffs' affidavits buttress those allegations, detailing the interrelationships between the corporate entities and the individuals, as well as the joint nature of the limited partnership offering by extracting language directly from the offering memoranda. So, too, do the individual defendants' affidavits. For example, Dana E. Friedman stated "In my capacity as attor-

ney for The Barrick Group, Inc., Director of The Barrick Group, Inc.'s management division and Vice–President of the law firm of Barth, Richheimer and Friedman, P.C., I performed certain real estate and legal work in connection with the transactions at issue in this litigation" (# 24, Par. 14). The plaintiffs' factual assertions meet the due process prerequisites to the application of the co-conspirator theory of venue that

> ... there must be a factual showing of a conspiracy and also a connection between the acts of the conspirator who was present in the jurisdiction and the conspirator who was absent. *Leasco Data Processing Equipment Corporation v. Maxwell*, 319 F.Supp. 1256, 1261 (S.D.N.Y.1970), *aff'd* in part, *rev'd* and remanded in part, 468 F.2d 1326 (2d Cir.1972).

It is not necessary that a claim of conspiracy be separately pleaded in order for the co-conspirator venue theory to apply. As noted on p. 319–20, *supra*, all that is required is "an action against multiple defendants alleging a common scheme of acts or transactions in violation of the securities statutes." *Securities Investor Protection Corporation v. Vigman*, *supra*, 764 F.2d at 1317. While it is true that a conspiracy was alleged in the *Securities Investor* case, the doctrine is fully applicable in cases such as this one in which a common scheme of acts and transactions in violation of the securities laws is alleged but no specific claim of conspiracy is stated. In the case of *Como v. Commerce Oil Co.*, 607 F.Supp. 335 (S.D.N.Y., 1985), plaintiffs stated the following claims: (1) material misrepresentations in connection with plaintiffs' investments, in violation of 15 U.S.C. § 78j(b), (2) RICO, (3) fraud under state law, (4) breach of contract, and (5) common law fraud. No conspiracy was charged. In rejecting a challenge to venue, the Court cited 15 U.S.C. § 78aa and wrote that:

> When two individuals cooperate in an alleged securities swindle, and one of them commits a material transgression of the Act in a particular district, venue exists for all coconspirators in that district. *Hill v. Turner*, 492 F.Supp. 61, 63–64 (M.D.Pa., 1980); *Keene Corp. v.*

*Weber*, 394 F.Supp. 787, 790 (S.D.N.Y., 1975). *Como v. Commerce Oil Co., Inc.*, *supra*, 607 F.Supp. at 342.

In sum, after considering all the plaintiffs' allegations and affidavits, I am of the opinion that venue is proper in this district as to all the Barth defendants under § 27 for

> It is well recognized that in multi-defendant and multi-forum securities fraud actions, any act committed material to and in furtherance of an alleged scheme will satisfy the venue requirements of the Exchange Act as to all defendants wherever they are found. *S.E.C. v. National Student Marketing Corporation*, 360 F.Supp. 284, 292 (D.D.C.1973) and cases cited therein.

The three individual defendants, i.e. Barth, Richheimer and Friedman, however, claim that the Court cannot obtain personal jurisdiction over them on the basis of the "fiduciary shield doctrine." They claim that any acts they performed as individuals in connection with the offerings were in their capacities as corporate fiduciaries, and acts performed in that role cannot be the predicate for the exercise of personal jurisdiction over them as individuals. In this connection, they cite the case of *Marine Midland Bank N.A. v. Miller*, 664 F.2d 899, 901 (2 Cir., 1981). In my opinion, the "fiduciary shield doctrine" is totally inapplicable to this case.

The "fiduciary shield doctrine" is set forth most succinctly in a case cited by the defendants, *Marine Midland Bank N.A. v. Miller*, 664 F.2d 899 (2 Cir., 1981) in which the Court wrote:

> ... if an individual has contact with a state only by virtue of his acts as a fiduciary of the corporation, he may be shielded from the exercise by that state, of jurisdiction over him personally on the basis of that conduct. Thus, his conduct, although it may subject him to personal liability, may not form the predicate for the exercise of jurisdiction over him as an individual. The underpinning of the fiduciary shield doctrine is the notion that it is unfair to force an individual to

defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer.

*Id.* at 902 (footnote omitted).

■ The doctrine is applied in cases such as *Miller* in which personal jurisdiction over the individual is asserted on the basis of a state long-arm statute. It has absolutely no application in a situation such as the instant case where the complaint states claims against the individuals under the 1934 Act and jurisdiction is predicated on 15 U.S.C. § 78aa which provides for nationwide service of process. In such a situation, there is no issue as to an individual's contacts with the forum state for purposes of establishing personal jurisdiction; all that need be shown is that the individual have sufficient contacts with the United States. *Securities Investor Protection Corp. v. Vigman, supra,* 764 F.2d at 1315.

In this connection, not one of the cases cited by the defendants at pp. 23–27 of their reply memorandum (# 24), including the *Miller* case, ever discussed the applicability of the "fiduciary shield doctrine" in the context of personal jurisdiction under the 1934 Act. In fact, with one exception, none of the cases cited contained any claims under the federal securities law at all. The exception is the case of *Como v. Commerce Oil Co., Inc., supra,* but the discussion as to the "fiduciary shield doctrine" in that case dealt only with so-called "Miller defendants." No securities claims had been brought against the "Miller defendants;" rather, the claims against them were for breach of contract and common law fraud. *Id.,* 607 F.Supp. at 338. Since personal jurisdiction could not be asserted over the "Miller defendants" under the 1934 Act in the absence of a claim against them under that Act, the Court had to analyze the question of personal jurisdiction in terms of the New York long-arm statute and the "fiduciary shield doctrine" became relevant. In the instant case, claims against the individual defendants under the 1934 Act are stated in Count IV of the Third Amended Complaint and the Court has personal jurisdiction over the individuals pursuant to that Act. Accordingly, the "fiduciary shield doctrine" is inapplicable to the question of personal jurisdiction.

■ Having determined that venue is proper under the broader provision of the 1934 Act, it follows that venue is likewise proper as to all the Barth defendants on all the claims arising under the Securities Act of 1933. See *Hilgeman v. National Insurance Company,* 547 F.2d 298 (5th Cir. 1977); *GRM v. Equine Investment and Management Group,* 596 F.Supp. 307, 311 (S.D.Tex.1984); *Sohn v. Dahl,* 392 F.Supp. 1208, 1214 (W.D.Va.1975); *S.E.C. v. National Student Marketing Corporation,* 360 F.Supp. 284, 291 (1973); *Zorn v. Anderson,* 263 F.Supp. 745, 747 (S.D.N.Y. 1966). The Supreme Court cases cited by the defendants to support their contrary position are not only readily distinguishable, they quite simply are not on point. See *Aldinger v. Howard,* 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976); *Ernst & Ernst v. Hockfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, *reh. denied,* 425 U.S. 1986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976).

The special venue provision governing RICO claims, 18 U.S.C. § 1965(a), provides:

(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

The intent of this provision was "to liberalize the existing venue provisions." *Van Schaick v. Church of Scientology of California, Inc.,* 535 F.Supp. 1125, 1133, n. 6 (D.Mass., 1982). However, the precise meaning of the provision is far from clear and what case law there is construing the provision is not uniform.

The RICO claim is found in Count XI of the Third Amended Complaints and purports to state claims against corporate defendants The Barrick Group, Inc., North American Investment Resources, Inc., Barrick Property Management, Inc., Barth, Richheimer and Friedman, P.C., Southwest Bissonnet, Inc., I–10 East Ralstyon, Inc.

and 515 North Belt. Inc. and individual defendants Barth, Richheimer and Friedman. Plaintiffs claim that venue as to these defendants on the RICO count exists in this District on the basis that the defendants were transacting their affairs within this district as that term is used in 18 U.S.C. § 1965(a).

The legislative history of § 1965(a) indicates that the RICO venue and process provisions were modeled after the venue provisions of the antitrust laws. *King v. Vesco*, 342 F.Supp. 120, 122 (N.D.Ca., 1972). In the *King* case, the Court noted that the legislative history of § 1965 included the statement that:

> Section 1965 contains broad provisions regarding venue and process, which are modeled on present antitrust legislation. *Id.* at 122, n. 2 quoting U.S. Code Cong. & Ad. News, pp. 4–34 (1970).

The Court then noted that the antitrust laws, particularly the Clayton Act (15 U.S.C., §§ 15, 22), provided that:

> ... a private treble damage antitrust action may be brought against an individual defendant "in the district in which the defendant resides, is found or has an agent * * *." As to a corporation defendant such an action " * * * may be brought not only in the judicial district in which it is an inhabitant, but in any district wherein it may be found or transacts business." *Id.* at 122.

The Court in the *King* case then went on to analyze whether or not venue existed in the Northern District of California for the corporate and individual defendant in that case by applying the tests found in the Clayton Act.

As to corporate defendants, the cases seem to be uniform in holding that the term "transacts his affairs" in § 1965 means precisely the same as the term "transacts business" as used in Section 12 of the Clayton Act. Accordingly, the first issue is whether the corporate defendants in the instant case can be said to have "transacted business" in Massachusetts. In my opinion, the answer to that question is in the affirmative.

A corporation transacts its business within a District if "... it regularly carries on business of a substantial and continuous character within that district." *Id.*, 342 F.Supp. at 124 citing *Bruner v. Republic Acceptance Corporation*, 191 F.Supp. 200, 203 (E.D.Ark., 1961). The precise wording of the definition of the term "transacts business" may vary but the principle is evident:

> The term "transacts business" has been defined to mean the practical everyday business or commercial concept of doing or carrying on business of any substantial character. *United States v. Scophony Corporation*, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed 1091 (1948). Courts have found that a corporation "transacts business" within their forum when a substantial business activity is done within the forum with continuity of character, regularity, contemporaneousness with time of service and not looking toward cessation of business. (citations omitted) *C.C.P. Corp. v. Wynn Oil Co.*, 354 F.Supp. 1275, 1278 (N.D.Ill., 1973).

Plaintiffs contend that this standard has been met and point to the Eaton affidavit in which the affiant states that from the Fall of 1982 through the end of 1984, he was solicited by and received written materials from the Affiliated Barrick Companies with respect to at least ten limited partnership offerings that they were sponsoring (# 41, ¶ 6). Further, Mr. Eaton avers that during that period he had spoken telephonically with representatives of the Affiliated Barrick Companies at least 100 times about these offerings and met with them in Massachusetts at least five times (# 41, ¶ 7). The defendants have accepted money from Massachusetts residents in connection with these offerings (# 41, ¶¶ 15, 16; # 42, ¶ 10). Finally, the records of the Securities Division of the Office of the Secretary of State indicate that the Affiliated Barrick Companies have registered at least eight limited partnership offerings in Massachusetts from the Fall of 1981 through the Summer of 1984 (# 43, Exhs. A and B). As noted *supra*, although the Barth corporate defendants categorically deny transacting or soliciting any business in Massachusetts,

deriving substantial revenue from Massachusetts or engaging in any persistent course of conduct in the Commonwealth, the factual assertions detailed by the plaintiffs have not been specifically contraverted.

The facts as asserted indicate that the corporate defendants' business contacts with this forum have been repeated, substantial and continuous over a period of years. The character of these contacts is sufficient to support venue in this district with respect to the RICO claims against the corporate Barth defendants.

The question of whether or not this Court has venue over the individual defendants on the RICO claim is a bit more troublesome.

Some Courts have held that as to individuals, the term "transacts his affairs" refers to personal affairs as opposed to affairs transacted as a representative of a corporation. In *King v. Vesco, supra*, the Court analyzed the question of whether or not the Court had venue over the individual defendant by examining whether or not he conducted any of his personal affairs in California. Subsequent cases have explicitly held that with respect to § 1965, "... it is the personal affairs of the defendant that are to be considered not affairs he may have transacted on behalf of his employer." *Bulk Oil (USA), Inc. v. Sun Oil Trading Co.*, 584 F.Supp. 36, 39 (S.D.N.Y., 1983). *See also Payne v. Marketing Showcase, Inc.*, 602 F.Supp. 656, 659 (N.D.Ill., 1985).

A variant of this line of cases is those cases discussing the "fiduciary shield doctrine" in the context of venue under RICO. In the *Bulk Oil* case, the Court rejected an argument that because venue of a RICO claim was proper as to a corporate defendant in New York, venue would be proper as to individuals who conducted the corporate defendants' business in New York. The Court reasoned that since "... [t]he 'transacts his affairs' language of section 1965(a) has ... been held to be synonymous with the 'transacts business' language of section 12 of the Clayton Act ..." and "[s]ince section 12 of the Clayton Act concerns the

'District in which to sue corporation,' it does not yield any authority precisely on point with respect to the question of whether the corporation's affairs may be imputed to an individual for venue purposes." *Bulk Oil, supra*, 584 F.Supp. at 39. Therefore, the Court relied on the test for jurisdiction under the New York long-arm statute. In doing so, the Court applied the "fiduciary shield doctrine" which is applicable to that statute and held that "... if an individual has contacts with the state only by virtue of his acts as a fiduciary of a corporation, he may be personally shielded from the exercise of jurisdiction in that state on the basis of that contact." *Bulk Oil, supra*, 584 F.Supp. at 40 citing *Marine Midland Bank N.A. v. Miller, supra*, 664 F.2d at 902.

However, subsequent cases have rejected this holding and applied the "fiduciary shield doctrine" only when a party resorts to the New York long-arm statute to establish jurisdiction. *Soltex Polymer Corp. v. Fortex Industries, Inc.*, 590 F.Supp. 1453, 1458 (E.D.N.Y., 1984); *Rolls–Royce Motors, Inc. v. Charles Schmitt & Co.*, 657 F.Supp. 1040, 1059 (S.D.N.Y., 1987). Other cases considering the *Bulk Oil* holding have refused to apply it in the case where the corporation is a "shell entity." *Miller Brewing Co. v. Landau*, 616 F.Supp. 1285, 1289 (E.D.Wis., 1985).

The *Rolls–Royce* and *Miller Brewing Co.* cases not only refuse to apply the "fiduciary shield doctrine", they also implicitly reject the notion that as to individual defendants, "transacts his business" refers to the defendant's personal affairs as distinguished from affairs transacted as an officer of a corporation. Thus, in the *Rolls–Royce* case, venue was found over one Schmitt "... because the fact that Schmitt is the President and principal shareholder of Schmitt Co., vitiates the viability of the distinction been corporate and individual affairs." 657 F.Supp. at 1059 (citing *Miller Brewing Co.* case). In *Miller Brewing Co.*, venue was found over defendant Landau because "... defendant Landau was the president and sole shareholder of RLA [and] it would certainly be

pointless if not impossible to distinguish his own affairs from those he undertook on behalf of the business he owned and controlled." 616 F.Supp. at 1289. The "same reasoning" was applied to find venue over the Executive Vice–President. As the Court wrote:

> Both defendants enjoyed positions within the business they operated such that the affairs of the business were, in reality, their own affairs. Any distinction between their affairs and those of [the corporation] would be superficial and misleading. *Id.*

■ In my opinion, the term "transacts his affairs" as used in § 1965(a) does not mean that venue of an individual defendant is restricted to a district in which the individual defendant conducts his personal affairs. In other words, I agree with the opinions in the *Rolls–Royce* and *Miller Brewing Co.* cases that in some circumstances, an individual who is "transacting" the "affairs" of a business in a district may be "transacting his affairs" in that district so as to support venue over him as an individual pursuant to § 1965(a). This is not to say that venue over individual officers of a corporation under 1965(a) can be found merely because venue exists for the corporation under that statute. If it has been determined that venue under § 1965(a) exists in a district for a corporate defendant because the corporate defendant regularly carries on business of a substantial and continuous character within the district, the issue as to whether there is venue for individual defendants who are agents of the corporate defendant is whether the individual defendants were in a position within the corporation such that it could be said that the corporation's affairs were, in reality, their affairs. Or put another way, the issue is whether the position of the individuals within the corporation was such that the individuals had actual power to control and exercised the power to control the corporation's transaction of business in the forum.

Applying that test to the instant case, it is noted that the individual defendants, Barth, Friedman and Richheimer, each deny any substantive personal or business contact with Massachusetts. The plaintiffs allege in their Third Amended Complaints that the Affiliated Barrick companies were under the control of defendants Barth, Richheimer and Friedman (¶ 4). The individuals' various corporate positions are detailed (¶¶ 10, 11 and 12). With regard to defendant Barth, the plaintiffs allege that he was the controlling shareholder of each of the Affiliated Barrick Companies and was directly responsible for oversight of the operations of each of the Affiliated Barrick Companies during the limited partnerships offering periods (¶ 10). There is no allegation that either defendant Richheimer or defendant Friedman have any ownership interest in any of the Affiliated Barrick Companies. Defendant Richheimer is alleged to be a resident of Connecticut and the Vice–President of The Barrick Group, Vice–President/Secretary of I–10 East Ralston, Inc., Southwest Bissonnet, Inc., 515 North Belt, Inc., Barrick Property Management, Inc. and North American Investment Resources, Inc. and a Partner in the law firm (¶ 11). Defendant Friedman is alleged to be a resident of Connecticut and a Partner in the law firm, Secretary of I–10 East Ralston, Inc., Southwest Bissonnet, Inc., 515 North Belt, Inc., the director of The Barrick Group's so-called Property Management and Administration Division, and was Chief Real Estate Counsel for the Affiliated Barrick Companies (¶ 12). It is alleged upon information and belief that Barth, Richheimer and Friedman directly participated in the preparation of the various offering memoranda (¶ 19), made offers on sales of limited partnership units to plaintiffs and others (¶ 20) and substantially assisted, as well as directly participated in, these offers and sales (¶ 13).

The Eaton and Cadiff affidavits identify Leslie Barth as the head of the Affiliated Barrick Companies and as being affiliated with the law firm of Barth, Richheimer, Marvin–Smith, Friedman and Scholnick (# 41, ¶ 2; # 42, ¶ 3). There are no averments that either Eaton or Cadiff spoke or met or communicated with Barth in Massachusetts. The defendants Friedman and Richheimer are not mentioned at all in the

two affidavits. Finally, although the signatures of all three men appear on documents filed with the Securities Division of the Department of the State Secretary, it is clear that these papers were signed by the individuals in their capacities as corporate officers and do not establish the degree of control which would demonstrate that the corporation's affairs were, in fact, the individual's affairs.

The question as to whether venue over the individual defendants is proper in this forum under § 1965(a) is a close one, especially as to defendant Barth. However, as to defendants Richheimer and Friedman, I do not think that the allegations of the Third Amended Complaint are sufficient to demonstrate that they had the power to exercise and did, in fact, exercise such control over the corporate defendants that it could be said that the corporate defendants' "affairs" were their individual "affairs." No other basis for asserting venue over these two individual defendants pursuant to 18 U.S.C. § 1965(a) has been asserted, and I can find none.

The next question is whether the Court should assert venue over the RICO claims against the individual defendants pursuant to 28 U.S.C. § 1391(b), which provides that an action may be maintained in the forum either where all the defendants reside or where the claim arose.

> In determining where a claim arose for venue purposes, courts generally apply a "weight of contacts" test, which holds that venue will be "in any district in which a substantial part of the acts, events or omissions occurred that gave rise to the claim for relief." *Commercial Lighting Products v. United States District Court*, 537 F.2d 1078, 1080 (9th Cir.1976). *Clement v. Pehar, supra*, 575 F.Supp. at 443.

The vast majority of acts which underly the transactions at issue in the instant case occurred in Connecticut. Moreover, only the acts vis-a-vis the Massachusetts plaintiffs could be said to have occurred in this district. In sum, the "weight of contacts" is not in this Commonwealth and, therefore, venue over the plaintiffs' RICO

claims against the three individual defendants is not proper in this forum under 28 U.S.C. § 1391(b).

Plaintiffs invite the Court to assert venue over the three individual defendants pursuant to 18 U.S.C. § 1965(b) which provides as follows:

> In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the Court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

This provision has been construed to be applicable only in a case in which there is venue for the RICO claim for at least one defendant in the forum but not as to others and there is no other district which would have venue of all defendants named in the RICO count. *Butcher's Union Local No. 498 v. SDC Investment, Inc.*, 788 F.2d 535–39 (9 Cir., 1986); *Farmers Bank of the State of Delaware v. Bell Mortgage Corporation*, 452 F.Supp. 1278, 1280, n. 2 (D.Del., 1978), 577 F.Supp. 34, 35 (D.Del., 1978); *Clement v. Pehar, supra*, 575 F.Supp. at 443, n. 5; *Rolls–Royce Motors, Inc. v. Charles Schmitt & Co., supra*, 657 F.Supp. at 1058, n. 13; *Soltex Polymer Corp. v. Fortex Industries, Inc., supra*, 590 F.Supp. at 1459; *Wood v. Barnette, Inc.*, 648 F.Supp. 936, 939–40 (E.D.Va., 1986). Plaintiffs have made no showing that venue as to all defendants named in the RICO count would not be proper in the District of Connecticut. Accordingly, the Court could not invoke the provisions of § 1965(b) to assert venue over the individual defendants.

It is true that this rule is not absolute; the requirements of the ends of justice would, in certain circumstances, permit the assertion of venue over some of the defendants in a RICO count pursuant to § 1965(b) even though venue as to all defendants would lie in another district. *See e.g. Miller Brewing Co. v. Landau, supra*, 616 F.Supp. at 1290–91 (dicta). However, the

availability of a nearby forum in which venue would exist for all defendants in the RICO count in the instant case prevents the invocation of § 1965(b) in the absence of some countervailing extraordinary circumstances which are not present in the instant case.

Accordingly, the plaintiffs' RICO claims against Richheimer and Friedman must be dismissed, but the dismissal shall be without prejudice. I do not rule with respect to the defendant Barth because the facts with respect to him are somewhat different and the case against him is stayed because of bankruptcy proceedings. *See*, p. 318, *supra*.

■ This Court has the power to exercise pendent jurisdiction over Counts VI, VII, VIII, IX and X of the complaints which purport to state claims under state law since they are premised upon and arise out of the same "common nucleus of operative facts." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). *See also Bertozzi v. King Louie International Inc.*, *supra*, 420 F.Supp. at 1171. While recognizing that there is a split of authority as to whether the venue provisions of the securities laws providing extraterritorial service of process are sufficient to support *in personam* and subject matter jurisdiction over defendants on pendent state claims, I note that the more recent decisions have uniformly held that non-federal pendent claims should be heard when they are based upon the same common facts as are the securities law violations. *Loveridge v. Dreagoux*, 678 F.2d 870, 876 (10 Cir., 1982); *International Controls Corp. v. Vesco*, 593 F.2d 166, 175, n. 5 (2 Cir., 1979); *Robinson v. Penn Central Company*, 484 F.2d 553, 556 (3 Cir., 1973); *Brunswick v. Regent*, 463 F.2d 1205, 1206, 1207 (5 Cir., 1972); *Bertozzi v. King Louie International, Inc.*, *supra*, 420 F.Supp. at 1171–72. I find these latter precedents to be persuasive. Since the Barth defendants are properly before this Court to answer the 1933 and 1934 Securities Acts claims, the interests of judicial economy, fairness, and the furtherance of the policies underlying the securities laws compel the conclusion that the pendent state claims should likewise be heard in this district. The Court, therefore, shall exercise its power to hear the plaintiffs' state law claims.

■ The determination having been made that venue and jurisdiction over all the plaintiffs' claims except the RICO counts against the three individual defendants are proper in this forum, the Court turns to the defendants' alternative motion to transfer these actions to the United States District Court for the District of Connecticut at New Haven. The basis of the requested transfer, i.e. 28 U.S.C. § 1404(a), provides that:

(a) For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

At the outset it should be noted that all parties to this litigation concur that these actions could properly have been brought in Connecticut. Section 1404(a) provides the federal courts with broad discretion for "an individualized case-by-case consideration of convenience and fairness." *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). Although the discretion granted by this provision is broader, the relevant factors to be taken into account are identical to those considered in applying the older doctrine of forum non conveniens. *Norwood v. Kirkpatrick*, 349 U.S. 29, 32, 75 S.Ct. 544, 546, 99 L.Ed. 789 (1955). "The burden rests with the defendants to establish that, on balance, the interests of justice and convenience weigh heavily in favor of transfer," *Securities and Exchange Commission v. National Student Marketing Corp.*, 360 F.Supp. 284, 295 (D.D.C., 1973). Unless the defendants carry their burden, the plaintiffs' choice of forum is entitled to considerable deference. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). The weight to be given to the plaintiffs' choice of forum

... is particularly strong in an action brought under the Securities Exchange

Act since the venue provision of the Act is designed to serve the underlying federal policy of allowing the plaintiff the widest possible choice of forums. (citation omitted) *S–G Securities, Inc. v. Fugua Investment Company, supra,* 466 F.Supp. at 1122.

Although the defendants in the instant case claim that the plaintiffs' choice of forum should be accorded less consideration because there are more plaintiffs living outside this district than within its borders, citing derivative and class action cases as support, they nonetheless do not dispute that it is a factor to be considered.

The defendants assert that all the significant acts and transactions about which the plaintiffs complain occurred in Connecticut, i.e., the formation of the limited partnerships, the preparation and drafting of the offering memoranda which represent the heart of the plaintiffs' claims. While it is true that these factors weigh in the defendants' favor (*Hall v. Kittay,* 396 F.Supp. 261, 263 (D.Del., 1975); *Blender v. Sibley,* 396 F.Supp. 300, 304 (E.D.Pa., 1975)), it is also true that the defendants' conduct within this district in connection with the limited partnership offerings has been significant. This connection with Massachusetts is not insubstantial and distinguishes the instant case from those cited by the defendants. *See Ackerman v. Clinical Data, Inc.,* CCH Sec. Law Rep. (Current Transfer Binder), § 92,207 (S.D.N.Y., 1985) [available on WESTLAW, 1985 WL 1884]; *Josephson v. McGuire,* 121 F.Supp. 83 (D.Ma., 1954), mandamus dismissed, 218 F.2d 174 (1 Cir., 1954).

In comparing the relative convenience to the parties, the defendants claim "almost all" of the documents which would be relevant to the sale of the limited partnership units are located at the Barth defendants' corporate offices in Connecticut. Even assuming, arguendo, that this is the case, the defendants have provided no information as to the volume of records involved nor whether the documents are necessary to the day-to-day running of the businesses such as to cause great disruption if they were removed. It is clear that:

> [G]eneral allegations that a transfer is needed because of the location of books and records are not enough. The moving papers must show the location, difficulty of transportation and importance of the books and records. (citations omitted)

*American Standard, Inc. v. Bendix Corp.,* 487 F.Supp. 254, 264 (W.D.Mo., 1980). *See also J.J. Kislak Mortgage Corporation v. The Connecticut Bank and Trust, NA,* 604 F.Supp. 346, 348 (S.D.Fla., 1985).

The defendants' affidavit (# 25) is plainly inadequate to allow the Court to make an informed judgment as to the possible inconvenience resulting from the location of the documents. Consequently, the defendants have failed to carry their burden to show any inconvenience with respect to the documents as a basis for a transfer.

The defendants fare no better on their argument regarding the convenience of witnesses. The defendants state that "the majority of witnesses at trial will be Movants, as well as those individuals who were principals and employees of Movants during the time period covered by the complaints, all of whom reside and transact business in Connecticut." (# 24, ¶ 25). Again, however, other than identifying the three individual defendants as probable witnesses, the defendants have made no attempt to advise the court who else would be called to testify or even the number of witnesses anticipated. Conclusory statements are not enough:

> ... [A] movant must provide precise information, in affidavit form, about the witnesses he intends to call and the anticipated areas of their testimony, so that the court can intelligently weigh the factor of witness convenience. *Riso Kagaku Corporation v. A.B. Dick Co.,* 300 F.Supp. 1007, 1010 especially at fn. 1 and 2 (S.D.N.Y.1969). *See also* Wright, Law of Federal Court § 44 (3rd Ed. 1976). *Car Freshner Corporation v. Auto Aid Manufacturing Corporation,* 438 F.Supp. 82, 85 (N.D.N.Y., 1977). *See also Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2 Cir., 1978); *American Standard Inc. v. Bendix Corp., su-*

*pra,* 487 F.Supp. at 262–63 and cases cited therein.

In short, the defendants have simply not made a persuasive showing that these actions should be transferred for the convenience of the witnesses.

After considering all the papers and arguments presented by the parties, as well as the factors relevant under § 1404(a), I find that a transfer of these actions to Connecticut is not warranted on the basis of the record now before me.

An Order shall issue.